# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| MATTHEW ORRSON, § | |
| *Plaintiff,* § | |
| § | CIVIL ACTION NO.: 4:25-cv-1776 |
| v. § | |
| § | |
| SIG SAUER, INC., § | |
| § | |
| *Defendant.* § | |
| § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff Matthew Orrson ("Plaintiff"), complaining of Sig Sauer, Inc. ("SIG") and for cause of action shows unto the Court the following:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over the subject matter of this lawsuit based on diversity of citizenship. *See* 28 U.S.C. § 1332(a). SIG is a corporation with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire 03801. The Plaintiff resides in Texas. Additionally, the amount in controversy is in excess of $75,000.

2. This Court has jurisdiction over the parties referenced above because all or a substantial part of the events giving rise to this dispute occurred within the State of Texas.

**PARTIES**

3. Plaintiff is an individual residing in Spring, Texas.

4. Defendant SIG is a corporation or other business entity with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire 03801, organized and incorporated

1

under the laws of Delaware. SIG has been properly served and has appeared in this action.

## GENERAL ALLEGATIONS

5. SIG designs and manufactures firearms for sale to law enforcement, military and commercial markets throughout the United States and internationally and markets and sells its products directly and through dealers.

6. At all relevant times, Defendant was acting by and through their employees, servants, and agents, acting within the course and scope of their employment, service and agency.

7. The SIG Sauer Model P320 is susceptible to unintended discharges, meaning it can fire without user intent and a full trigger pull.

8. There have been a significant number of known incidents of SIG P320s unintentionally discharging. Many of which have caused severe injury to the users and/or bystanders.

9. Sadly, the SIG P320 unintentional discharges continue at an alarming rate putting its users at risk of death or serious bodily injury by performing everyday tasks.

10. Upon information and belief, SIG is aware of over 100 incidents involving unintentional discharges of a SIG P320.

11. At the time of Plaintiff's purchase, multiple law enforcement agencies had banned or discontinued use of the P320 due to safety concerns.

12. The P320 is designed so that forcible rearward movement or "racking" of the slide places the striker under 100% spring tension, making it fully cocked and ready to fire.

13. Pulling the trigger of the P320 drops the sear wall holding the striker foot in place, it does not further cock the striker spring. The P320 is already fully spring charged once the slide is racked.

14. Upon information and belief, every striker-fired pistol on the market—except those sold by SIG—is under far less than 100% striker spring pressure and is equipped with some type of external safety.

15. In fact, any single action, striker fired gun without a tabbed trigger or thumb safety is inherently unsafe and at major risk for drop fires and other discharges without a full trigger pull.

16. The purpose of a tabbed trigger safety is to prevent drop fires and to prevent discharge if the trigger is subjected to any pressure that is not a direct firing pull.

17. Despite its manufacturing ability, SIG never included a tabbed trigger safety as a feature of the P320.

18. To be clear, the defect alleged herein is not merely the absence of a manual safety, but rather the P320's propensity to discharge without any trigger pull whatsoever due to defective internal components including but not limited to defective sear-striker engagement, inadequate trigger disconnect safety, failure of internal safeties to prevent uncommanded discharge.

19. SIG's design and manufacture of the P320 rendered the weapon unreasonably dangerous for its intended uses and for any foreseeable uses, including normal carrying, holstering, un-holstering, and/or handling.

20. SIG knew, as early as 2014 and possibly earlier, that defective discharges caused by cumulative or sudden vibration, inertial impulses, drops and/or slight trigger actuations by foreign objects were a known risk of the P320's single action, fully cocked design. A review of SIG's own testing documentation, patent documents and press releases makes this clear.

21. SIG knew that unintended trigger actuation by a foreign object such as a holster wall coming into contact with the P320's unprotected trigger could result in defective, unintended discharges causing severe injury or death.

22. SIG also knew of the ability of the P320's precarious striker foot-sear engagement to disengage, leading to an unintentional discharge merely upon repeated inertial impulses to the P320's slide, frame and fire control unit.

23. SIG scrambled behind the scenes for a solution to the problem of unintended discharges as incidents continued to multiply around the country. It applied for a patent in 2017 to modify the P320 to include a "back-up" sear wall to catch the striker if the primary, spring-

tensioned engagement failed, which SIG knew could happen and was happening in the real world.

24.     SIG had knowledge long before the sales of the P320s used by Plaintiff that the P320 was capable of firing unintentionally due to defective components, inertial impulses, and the lack of necessary safety features, including a manual thumb safety, a tabbed trigger safety, and internal plunger safety, and de-cocker.

25.     SIG knew the latter fact as early as December 2013, as the company's own inhouse testing demonstrated.

26.     When SIG shipped P320s to dealers for sale to law enforcement agencies and civil customers in 2014, it knew or should have known: a) that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, and other foreseeable uses; and b) that un-commanded discharges could and would occur in the ordinary course of using the weapon.

27.     In its "Safety Without Compromise" marketing materials for the SIG P320, SIG expressly represents "We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to."



28.     Despite this express representation, which SIG has made for years, the weapon lacks industry-standard safety features and has discharged unintentionally without an intentional trigger pull countless times.

29.     Since the P320's distribution into the stream of commerce, SIG has expressly represented that the weapon possessed a "robust safety system."

Page **5** of **6**



30.     Many U.S. law enforcement agencies, local police departments, military personnel (at a commander's discretion), and private owners routinely carry pistols with a chambered round.

31.     At all relevant times SIG knew many of its customers carry with a chambered round and that American law enforcement agencies as a rule carry with a chambered round.

32.     In fact, SIG advertises that users can carry the P320 with a round chambered by annotating the P320's capacity in various configurations such as "10 + 1," and "12 + 1."

33.     For more than a decade since the weapon was introduced to the market in 2014 and since SIG became aware of the risks of the P320's design, SIG wantonly failed to recall the P320,

or issue an unambiguous safety warning about it, despite SIG's knowledge of grievous wounds inflicted upon users and bystanders, as well as the company's knowledge that vibration as well as inertial impulses can make the P320 fire without a trigger pull.

34. Despite having knowledge of the P320's severe defects, SIG did not adequately warn the public about the dangers of the P320 or issue a mandatory recall, as it had done for other of its products that contained defects.

35. Law enforcement and civilian users were left with daily risk of harm including death from the P320.

36. To date, SIG has never issued a mandatory recall or safety notice regarding the P320 and continues to sell it.

37. SIG's conduct including design, manufacturing and marketing decisions prioritized profits over the health and safety of its users and those in the vicinity of the P320.

## STATEMENT OF FACTS

38. On Friday, March 8, 2024, Plaintiff Matthew Orrson, an off-duty Deputy with the Harris County Sheriff's Office, experienced an uncommanded discharge from his personally-purchased and owned SIG Sauer P320 9mm handgun, which fired without any trigger actuation or trigger pull.

39. On that day, Plaintiff was removing his SIG Sauer P320 9mm handgun from the pocket of his shorts while the firearm remained fully secured inside a Kydex holster.

40. The holster was a "full wrap" design that completely covered nearly the entire handgun and trigger guard, providing full protection of the trigger area.

41. As Plaintiff was removing the firearm and holster together as a single unit, the handgun discharged unexpectedly while still secured inside the holster, without Plaintiff pulling the trigger.

42. The projectile struck Plaintiff on the front of his left leg near his pelvic area, causing

significant injury.

43. Plaintiff immediately administered emergency first aid by applying a North American Rescue CAT Tourniquet to his left leg. Upon the arrival of responding deputies, they assessed the tourniquet application and applied a second North American Rescue CAT Tourniquet. Shortly thereafter, Plaintiff was transported to the hospital.

44. As a direct result of the unintentional discharge, Plaintiff suffered serious physical injuries requiring emergency medical treatment, ongoing medical care, pain and suffering, and other damages detailed elsewhere in this petition.

45. Plaintiff purchased the subject P320 for personal use. When Plaintiff purchased the P320, he relied on Sig Sauer's representations about the weapon's safety and reliability, including claims that the gun would not fire unless the trigger was pulled and that it was trusted by law enforcement.

46. At the time of Plaintiff's purchase, multiple law enforcement agencies had banned or discontinued use of the P320 due to safety concerns. Plaintiff was unaware of these bans when he purchased his P320.

47. Had Plaintiff known that the P320 could fire without the trigger being pulled and/or that multiple law enforcement agencies had banned the P320 due to safety concerns, he would not have purchased the firearm. Moreover, had Plaintiff been adequately warned that the P320 could discharge without any trigger actuation due to internal component failures, he would not have purchased/carried the firearm

## CAUSES OF ACTION

### A. Negligence

48. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

49. At all relevant times, SIG owed Plaintiff the duty to design the P320, before selling the P320 and placing it into the stream of Commerce, in such a manner and with the exercise of

reasonable care, so as to prevent it from firing upon him merely by removing the holstered P320 or without pulling the trigger.

50. At all relevant times, SIG owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the P320 unreasonably dangerous to handle or use. Upon information and belief, SIG knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publication and research, and other sources of information to be developed in discovery.

51. SIG breached their above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

   i. By failing to use due care in designing the P320, failing to incorporate an external safety to prevent unintended discharges;

   ii. By failing to use due care in designing and manufacturing the P320's internal components to prevent un-commanded discharges;

   iii. By failing to issue a mandatory recall of the P320;

   iv. By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the P320's propensity to discharge un-commanded as described above;

   v. By negligently failing to unambiguously warn purchasers and end users of the P320, including Plaintiff, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

   vi. By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the P320's propensity to discharge un-commanded while in the possession of SIG, and during which times its employees, servants or agents had an opportunity to inspect, service and work on the P320;

   vii. By misrepresenting and concealing, the dangers and hazards posed by the P320;

   viii. By minimizing quality control expenses;

   ix. By failing to design a firearm that would be safe for all users to operate under

        ordinary circumstances;

    x. By failing to incorporate necessary information, warnings, and instructions within the P320 manual and web pages;

    xi. By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

    xii. By failing to incorporate safeties which were standard among all of the P320's competitors;

    xiii. By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    xiv. Other negligent acts and omissions to be developed in the course of discovery.

52. SIG's negligence caused the P320 to not function in a manner reasonably expected by an ordinary consumer of firearms, as no consumer would expect a properly designed firearm to discharge without the trigger being pulled.

53. SIG knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the P320 would or could give rise to serious bodily injuries to such users, up to and including death.

54. The P320's defective condition was not visible and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

55. SIG's negligence as alleged in this Count directly and proximately caused the March 8, 2024 un-commanded discharge and Plaintiff's injuries resulting from the accident.

56. As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, and inconvenience.

57. Moreover, SIG's conduct constitutes gross negligence, as SIG acted with conscious indifference to the rights, safety, and welfare of P320 users by continuing to manufacture, market,

and sell the P320 despite actual knowledge of over 100 unintended discharge incidents and the unreasonable risk of serious bodily injury or death posed by the defective design

### B. Strict Liability

58. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

59. At all times material hereto, SIG was in the business of marketing, selling, and distributing weapons, including the P320 causing Plaintiff's injuries. Upon information and belief, SIG knew or had reason to know the P320 would be situated in holsters, and that the purchaser was in fact relying on SIG's skill, judgment, and implied warranty of the P320's fitness for that particular purpose without discharging.

60. Accordingly, SIG impliedly warranted that the P320 was suitable for the particular purpose of being situated within a holster during ordinary carrying and handling, and was free from any design or manufacturing defect.

61. Put more simply, SIG impliedly warranted that the P320 would not discharge without the user pulling the trigger.

62. At all relevant times, Plaintiff used the P320 in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG in using and handling the P320.

63. The P320 at issue contained a design and/or manufacturing defect. SIG is strictly liable for the design and/or manufacturing defect in Plaintiff's P320 and for acting with complete disregard for Plaintiff's safety and those around him.

64. SIG's defective design caused the P320 to not function in a manner reasonably expected by an ordinary consumer of firearms, as no consumer would expect a properly designed

firearm to discharge without the trigger being pulled.

65.     As a direct and proximate result of the design and/or manufacturing defect, Plaintiff suffered severe physical injury, mental anguish, and inconvenience.

### C. Breach of Implied Warranty of Merchantability

66.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

67.     At all relevant times, SIG was in the business of marketing, selling, and distributing weapons, including the P320 causing Plaintiff's injuries.

68.     Plaintiff purchased the subject P320 for personal use.

69.     SIG knew of the ordinary purposes for which the P320 was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrated" and handled while situated within and without a holster) and all other reasonable foreseeable uses.

70.     At all relevant times, Plaintiff used the P320 in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG. SIG breached the above-referenced implied warranties as to the P320 because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

i. Failing to use due care in its designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

ii. Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

iii. Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the P320's propensity to discharge accidentally as described above;

    iv. Negligently failing to unambiguously warn purchasers and end users of the P320, including Plaintiff, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    v. Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the P320's propensity to discharge accidentally while in the possession of SIG, during which times employees, servants, or agents of SIG had an opportunity to inspect, service and work on the P320;

71. Plaintiff, as the end user (and purchaser) of the P320, was a person who would foreseeably be injured by breaching the implied warranty referenced in this Count and SIG's breach of the warranty of merchantability as alleged herein directly and proximately caused the accident on March 8, 2024 and Plaintiff's claimed injuries.

72. As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, and inconvenience.

### D. Breach of Express Warranty

73. Plaintiff incorporates the proceeding paragraphs as fully set forth herein.

74. At all times material hereto, SIG was in the business of marketing, selling, and distributing weapons, including the P320 causing Plaintiff's injuries.

75. Upon information and belief, SIG knew, or had reason to know, that the P320 (i) would be situated in holsters, (ii) that users and owners would walk around with P320 situated in holsters, and (iii) that the users were in fact relying on SIG's skill, judgment, and express warranty of the P320's fitness for those particular purposes and would not fire.

76. SIG expressly warranted that the P320 was safe and would not fire unless the trigger was pulled.

77. SIG expressly warranted that the P320 was trusted by law enforcement.

78. At all relevant times, Plaintiff used the P320 in its intended manner, and for its intended purposes.

79. Plaintiff personally purchased the P320 in reliance on these express warranties. Specifically, Plaintiff relied upon SIG's representations that the P320 "won't fire unless you want it to" and that it was "trusted by law enforcement" when making his purchasing decision.

80. SIG breached the above referenced express warranty as to the P320s in that they fired without a trigger pull and were unreasonably dangerous at the time it left SIG's possession by virtue of:

   i. Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and omitting a mechanical disconnect switch, so as to prevent accidental discharges;

   ii. Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products

   iii. Failing to make reasonable tests and/or inspections to discover the defective hazardous and unreasonably dangerous conditions relating to the P320's propensity to discharge accidentally as described above;

   iv. Negligently failing to unambiguously and conspicuously warn purchasers and end users of the P320, including Plaintiff, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

   v. Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the P320's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the P320;

   vi. Expressly warranting that the P320 would not fire unless the trigger was pulled.

## JURY DEMAND

81. Plaintiff hereby demands a trial by jury as to all claims in this action.

## PRAYER

82. Plaintiff seeks damages in excess of the minimum jurisdictional limits of this court, pre-judgment and post-judgment interest, court costs, and all such other relief to which Plaintiff shows himself justly entitled, including but not limited to:

   a. Actual damages;

    b. Past and future medical expenses;
    c. Past and future pain and suffering;
    d. Past and future mental anguish;
    e. Past and future impairment; and
    f. Exemplary/punitive damages.

Respectfully submitted,

**WILLIAMS HART & BOUNDAS, LLP**

By: */s/ Cesar Tavares*
Cesar Tavares
State Bar No. 24093726
Alma J. Reyes
State Bar No. 24064392
Michael Samaniego
State Bar No. 24115715
Alejandro Salicrup
State Bar No. 24138723
8441 Gulf Frwy, Suite 600
Houston, Texas 77017-5001
(713) 230-2200- Tel.
(713) 643-6226- Fax.
TavaresLitTeam@whlaw.com

**ATTORNEYS FOR PLAINTIFF**

### CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been filed with the Court on this 14th day of July 2025, using the ECF system, and the Clerk of the Court has electronically served notice of the foregoing upon all parties registered to receive electronic notice of this case.

*/s/Cesar Tavares*
Cesar Tavares